940 So.2d 105 (2006)
David Lewis STATEN, Jr., Plaintiff-Appellant
v.
Bruce Edward BROWN, Defendant-Appellee.
No. 41,288-CA.
Court of Appeal of Louisiana, Second Circuit.
September 20, 2006.
*106 Fewell-Kitchens, by: Richard L. Fewell, Jr., for Appellant.
Paul Henry Kidd, Jr., Monroe, for Appellee.
Before CARAWAY, DREW and MOORE, JJ.
DREW, J.
DLS sought to establish his paternity of two children born to YFB during her *107 marriage to BEB. DLS appealed a judgment which found that his paternity claim as to the older child was barred by prescription or peremption, and that La. C.C. art. 191 (since replaced by La. C.C. art. 198) did not offend due process and was constitutional. On appeal, DLS contends the trial court erred in ruling that his action to establish his paternity of the older child had prescribed and that former C.C. art. 191 was constitutional. For the following reasons, the judgment of the trial court is affirmed.

BACKGROUND
In his petition to establish his paternity, DLS alleged:
 SWB and TEB were born during the marriage of YFB and BEB.
 The mother died of an aneurysm on December 4, 2004.
 2005 DNA testing concluded the probability of DLS's paternity of the two children was well over 99%.
 A maternal aunt had physical custody of the children.
 Under La. R.S. 9:296, DLS sought additional DNA testing of BEB.
 DLS requested that once paternity was established, the court grant him custody of the children.
Relying on C.C. art. 191, BEB responded to DLS's action with an exception of prescription and/or peremption as to DLS's claim concerning the older child. By joint motion, the parties supplemented the appellate record with the deposition of DLS taken July 8, 2005, and filed at the trial court hearing on December 12, 2005.
In the deposition, DLS stated he first met the mother in 2000 while she was living with her husband, BEB. DLS and the mother began their sexual relationship in December 2000 after which he saw her every weekend. DLS acknowledged that when YFB became pregnant and during her first pregnancy, she lived with her husband. After the first baby was born, she and DLS lived at her friend's home. He stated he also saw the children after their births at her grandmother's house where the mother's aunt also lived. DLS said that while the mother was separated from BEB, DLS and the mother "stayed together" at the Town and Country off Jennifer Lane at the home of the mother's best friend from fall 2002 until about summer 2004.
The mother told him she was pregnant in July 2002 which he remembered because they had just returned from the Essence Festival in New Orleans. DLS was positive the older child was his because the mother told him she and her husband were not having sexual relations. She was continuing to live with her husband at the time the first child was born. DLS stated he visited the hospital and saw the baby the day after he was born.
DLS described the mother as kind of angry about the second pregnancy. Although the deposition twice showed DLS nodded his head affirmatively when asked if the mother was living with her husband during the second pregnancy, DLS contradicted himself by stating she never lived with her husband following the birth of the older child. Although DLS and the mother stopped living together in July 2004 when finances became a problem, DLS stated they continued their sexual relationship after the mother moved to her grandmother's home.
DLS explained that he did not pursue his claim of fatherhood earlier because he did not want to jeopardize the children's benefits. After the mother died, DLS stated that the husband let the children stay with a maternal aunt two or three days a week until BEB was off work. DLS saw the children when they were *108 with the aunt. In DLS's opinion, BEB thought himself to be the older child's father but suspected he might not be the father of his wife's second child. DLS said he would not exclude BEB from the lives of the children and would not have a problem with a set weekend visitation. He acknowledged that if the second set of DNA tests showed the children had different fathers, DLS would cease his efforts because he would not separate the children. DLS said the children's Social Security benefit was $1200 a month.

TIMELINE

Earlier Date YFB and BEB married.
December 2000 DLS and YFB begin
 sexual relationship.
December 19, 2002 SWB born.
June 25, 2004 Effective date of Act 530 of 2004
 Louisiana Legislature enacting La.
 C.C. art 191 which stated in § 3
 that the provisions of the act "shall
 be applied both prospectively and
 retroactively and shall be applied to
 all pending and existing claims."

Former La. C.C. art. 191 stated:
A. A man may establish his paternity of a child presumed to be the child of another man even though the presumption has not been rebutted.
B. This action shall be instituted within two years from the date of the birth of the child, except as may otherwise be provided by law. Nonetheless, if the mother in bad faith deceives the father of the child regarding his paternity, the action shall be instituted within one year from the date the father knew or should have known of his paternity, but no more than ten years from the date of birth of the child.

August 31, 2004 TEB born.
December 4, 2004 YFB died.
April 20, 2005 DLS filed paternity action.
June 29, 2005 Effective date of La. C.C. art. 198,
 which states:

A man may institute an action to establish his paternity of a child at any time except as provided in this Article. The action is strictly personal.
If the child is presumed to be the child of another man, the action shall be instituted within one year from the day of the birth of the child. Nevertheless, if the mother in bad faith deceived the father of the child regarding his paternity, the action shall be instituted within one year from the day the father knew or should have known of his paternity, or within ten years from the day of the birth of the child, whichever first occurs.
In all cases, the action shall be instituted no later than one year from the day of the death of the child.
The time periods in this Article are peremptive.
In T.D. v. M.M.M., 98-0167 (La.3/2/99), 730 So.2d 873, a man asserted his paternity of a child legally presumed to be the child of the husband of the child's mother. The supreme court discussed the law of establishing paternity prior to the enactment of Civil Code articles setting time limitations on avowal actions. Seeking recognition of his paternity, joint custody and visitation, the biological father intervened in December 1994 in a custody dispute between the mother and her husband during their divorce proceedings. The child was conceived during an adulterous affair in March 1988 which continued after the birth of the child. The biological father visited with the mother and child and suspected he was the father. The mother curbed her paramour's visitation during her separation from her husband. Paternity testing done in April 1993 showed in June 1993 a 99.5% probability that the paramour was the father. In November 1993 the mother ended the affair and thereafter denied the biological father access to the child.
The appellate court dismissed the biological father's intervention based upon the common law concept of laches, the purpose of which is to prevent an injustice resulting *109 from seeking to enforce long neglected rights difficult to enforce as a result of the delay. The supreme court reversed, noting that common law concept of laches is used in Louisiana only in rare and extraordinary circumstances. There was no prescriptive statute applicable to the father's effort to avow his biological child. First, the court found that no prejudice occurred as a result of the delay in bringing the action, since the father would have contact with the child only if the court found that was in the child's best interest. Moreover, the father's delay in bringing the action resulted at least in part from the actions of the mother who attempted to thwart visitation only after the affair finally ended. The rare and extraordinary circumstances required to apply laches were not present. The matter was remanded for a determination of the best interests of the child.
In a concurrence, Justice Knoll pointed out that a biological father's substantive rights to conceive and rear a child are not violated by application of a "best interest of the child" determination. The justice opined that the fact that a biological father is thwarted from exercising parental rights while the mother is married to another man is not constitutionally offensive because the balance of competing interests tips in favor of preserving the family unit.
In Louisiana, dual paternity is legally permissible, giving the child the benefits of filiation to both fathers. Dual paternity allows a child to seek support from the biological father notwithstanding that the child was conceived or born during the mother's marriage to another man, and is therefore presumed to be the legitimate child of the marriage. A legitimate father's status is not affected by an action to establish biological paternity, and a biological father does not escape his support obligations merely because a legal father may share the responsibility. State ex rel. Dept. of Social Services v. Howard, 2003-2865 (La.App. 1st Cir.12/30/04), 898 So.2d 443.
In a recent case in which an alleged biological father sought to avow paternity of a child born during the mother's marriage to another man, the third circuit found that applying La. C.C. art. 191 to bar the biological father's avowal action was an unconstitutional abridgement of his right to due process. W.R.M. v. H.C.V. and M.J.V., 05-425 (La.App. 3d Cir.3/1/06), 923 So.2d 911. On June 23, 2006, the supreme court granted writs in the companion case at 05-608 (La.App. 3d Cir.3/1/06), 923 So.2d 916, which reversed and remanded for the reasons stated in 923 So.2d 911. See W.R.M. v. H.C.V. and M.J.V. XXXX-XXXX (La.6/23/06), 931 So.2d 1090, which is pending before that court.
The relationship between W.R.M. and the mother began in 1992 and the child was born on September 1, 1994. The mother terminated the relationship in November 2004. In the interim, she divorced her husband in October 1996 and W.R.M. filed a petition to establish filiation on July 7, 2003. La. C.C. art. 191 became effective on June 25, 2004, and required that an avowal action be instituted within two years from the birth of the child, unless the mother deceived the father about his paternity. The third circuit found that at the time W.R.M. filed his avowal action in 2003 he had a vested right to sue to establish his paternity. The court concluded that a retroactive application of art. 191 would be an unconstitutional abridgement of W.R.M.'s right to due process. W.R.M. v. H.C.V. and M.J.V., supra. As previously noted, the matter is pending before the supreme court.
Statutes are generally presumed constitutional, and the burden of proving unconstitutionality is on the challenging *110 party. The legislature can set limits on enforcement of vested rights, provided that the legislature provides a reasonable time in which to enforce the vested right. Too short a time period is a denial of justice and "due process." W.R.M. v. H.C.V. and M.J.V., supra.
The Louisiana legislature made the time limits in art. 191 and the current art. 198 peremptive. The legislature clearly provided that La. C.C. art. 198 is peremptive. The term peremption was not specifically used in art. 191. However, Act 530 of the 2004 Louisiana Legislature, which enacted both art. 191 and R.S. 9:395.1, stated in 9:395.1 that the two-year period in art. 191 was peremptive. The time limitation of peremption is not subject to interruption or suspension. Peremption totally destroys the previously-existing right with the result that, upon expiration of the prescribed period, a cause of action or substantive right no longer exists to be enforced. Bunge Corp. v. GATX Corp., 557 So.2d 1376 (La.1990).
As noted in pertinent part in Revision Comment (e) to Article 198:
Requiring that the biological father institute the avowal action quickly is intended to protect the child from the upheaval of such litigation and its consequences in circumstances where the child may actually live in an existing intact family with his mother and presumed father or may have become attached over many years to the man presumed to be his father.
The legislature's interest in stabilizing the family is reflected by the legislature's decision to make the two-year period peremptive rather than prescriptive.
DLS clearly stated at his deposition that he knew he was the father of both children immediately on learning of the mother's pregnancies. The trial court specifically found that DLS knew of his paternity and was not deceived. Under the facts in this case, we cannot conclude that the nearly six months allowed by retroactive application of art. 191 was an unreasonably short time. Therefore, art. 191 is not unconstitutional as applied in this case. Because art. 191 was the applicable law in this dispute, it is not necessary to address constitutional questions concerning current Article 198.
Finally, we note that these two young children who have lost their mother have a legitimate, legal father, BEB, since they were born during his marriage to their mother. Whatever the outcome of the various paternity tests, the best interests of these children must be particularly determined in setting any appropriate custody and/or visitation. Stability and not separating them are factors which weigh heavily in deciding their best interests.

DECREE
With costs assessed against DLS, the judgment of the trial court is AFFIRMED.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
The majority sets forth clearly the law before and after the 2004 enactment of Civil Code Article 191 (now replaced by Article 198). In June 2004, immediately before the enactment of Article 191, DLS was under no specific time constraint regarding his ability to avow paternity of SWB or TEB, who was to be born two months later. T.D. v. M.M.M., 98-0167 (La.3/2/99), 730 So.2d 873. Likewise, at that time, the best interests of those two siblings regarding a relationship with DLS were not subject to any peremptive period. We are now called upon to set a purely transitional prescriptive rule for a unique *111 case which has facts that evolved on both sides of the date of the enactment of Article 191. The majority indicates agreement with the Third Circuit Court of Appeal that, despite the express retroactivity language of Article 191, DLS had to be provided with some reasonable time to act after June 25, 2004, regardless of the prior date of birth of SWB. If SWB had been born on June 26, 2002, the peremptive period of the statute would not be allowed to make such a sudden divestiture of the parties' rights one day after its enactment on June 26, 2004. I would therefore fix the time period for DLS to act at one year from the date of the June 25, 2004 statute as my transitional rule to govern the few cases such as this that may ever arise. This would be in keeping with the similar one-year periods expressed in former Article 191 and new Article 198. Accordingly, I respectfully dissent.